TIMOTHY COURCHAINE
United States Attorney
District of Arizona

MATTHEW WILLIAMS
Assistant United States Attorney
Arizona State Bar No. 029059
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: Matthew.Williams3@usdoj.gov

LORINDA LARYEA
Acting Chief, Fraud Section
United States Department of Justice

WILLIAM HOCHUL III
SHANE BUTLAND
Trial Attorneys
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-538-4256
Email: william.hochul.iii@usdoj.gov
*Attorneys for Plaintiff*

REDACTED FOR PUBLIC DISCLOSURE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

REDACTED FOR PUBLIC DISCLOSURE

| United States of America, | No. CR-25-00915-PHX-SMB (ESW) |
|---|---|
| Plaintiff, | **I N D I C T M E N T** |
| vs. | VIO: 18 U.S.C. § 1349<br>(Conspiracy to Commit Heath Care Fraud)<br>Count 1 |
| 1. Tyler Kontos,<br>(Counts 1, 6–7, 11)<br>2. Joel Max Kupetz,<br>a/k/a Max Kupetz, and<br>(Counts 1–4, 7–10)<br>3. Jorge Kinds,<br>(Counts 1–2, 4–5, 7) | 18 U.S.C. §§ 1347, 2<br>(Health Care Fraud)<br>Counts 2–6<br><br>18 U.S.C. § 371<br>(Conspiracy to Defraud the United States)<br>Count 7<br><br>42 U.S.C. § 1320a-7b(b)(1);<br>18 U.S.C. § 2<br>(Receiving Health Care Kickbacks)<br>Counts 8–9 |
| Defendants. | 18 U.S.C. §§ 1957, 2<br>(Transactional Money Laundering)<br>Counts 10–11<br><br>18 U.S.C. § 981(a)(1)(A), (C)<br>18 U.S.C. § 982(a)(1), (7), (b)<br>21 U.S.C. § 853<br>28 U.S.C. § 2461(c)<br>(Forfeiture Allegation) |

**THE GRAND JURY CHARGES**:

At all times material to this Indictment, within the District of Arizona and elsewhere:

### INTRODUCTION

1. Defendants TYLER KONTOS, JOEL MAX KUPETZ ("MAX KUPETZ"), and JORGE KINDS, together with their co-conspirators, targeted elderly Medicare beneficiaries, many of whom were terminally ill in hospice care, and caused medically unnecessary amniotic wound allografts to be applied to these vulnerable individuals. From in or around January 2023 through in or around March 2024, the Defendants and their co-

- 2 -

conspirators caused more than approximately $1 billion in false and fraudulent claims to Medicare and other health care benefit programs for these medically unnecessary allografts.

**The Defendants and Related Entities**

2. Defendant TYLER KONTOS was a resident of Mesa, Arizona. From in or around July 2023 through in or around February 2024, TYLER KONTOS was an independent contractor with Apex Medical LLC ("Apex") and Viking Medical Consultants LLC (d/b/a "Viking Medical Marketing LLC") ("Viking"). Beginning on September 2023, his title was Hospice and Home Health Director. TYLER KONTOS was not a medical professional and had no medical training.

3. Defendant MAX KUPETZ was a resident of Scottsdale, Arizona. From in or around February 2023 through in or around March 2024, MAX KUPETZ was an independent contractor with Apex and Viking, and his title was sales representative. MAX KUPETZ was not a medical professional and had no medical training.

4. Defendant JORGE KINDS was a resident of Phoenix, Arizona. JORGE KINDS was nurse practitioner licensed by the State of Arizona and an enrolled Medicare provider. From in or around January 2023 through in or around February 2024, JORGE KINDS applied allografts sold by Company 1 to Medicare beneficiaries as an independent contractor with Apex Mobile Medical LLC ("Apex Mobile") and APX Mobile Medical LLC ("APX"). From in or around December 2023 through in or around February 2024, JORGE KINDS was also APX's Assistant Medical Director.

5. Apex was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. Apex arranged for and recommended the ordering and purchasing of allografts sold by Company 1. Apex also referred patients to enrolled Medicare providers, including Apex Mobile and APX, for the furnishing of allografts purchased from Company 1.

6. Viking was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. Viking arranged for and

recommended the ordering and purchasing of allografts sold by Company 1. Viking also referred patients to enrolled Medicare providers, including APX, for the furnishing of allografts purchased from Company 1.

7. Apex Mobile was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. Apex Mobile was an enrolled Medicare provider and submitted claims to Medicare for payment, including claims for furnishing allografts purchased from Company 1.

8. APX was a limited liability company formed under the laws of Arizona, with its principal place of business in Phoenix, Arizona. APX was an enrolled Medicare provider and submitted claims to Medicare for payment, including claims for furnishing allografts purchased from Company 1.

9. "Company 1" was a limited liability company formed under the laws of Texas, with its principal place of business in Fort Worth, Texas. Company 1 was a wholesale distributor of allografts. Medicare reimbursed claims for allografts distributed by Company 1 at an extremely high rate, exceeding $1,000 per square centimeter for certain allografts.

**The Medicare Program**

10. The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were 65 years of age or over or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

11. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

12. Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part A" covered, among others, health services provided by

skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" covered, among other things, medical items and services provided by physicians, nurse practitioners, group practices, and other qualified health care providers that were medically necessary and ordered by licensed medical doctors or qualified health care providers.

13. Physicians, nurse practitioners, group practices, and other health care providers (collectively, "providers") that provided items and services to beneficiaries were able to apply for and obtain a "provider number." A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for items and services provided to beneficiaries.

14. A Medicare claim was required to contain certain information, including: (a) the beneficiary's name; (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the ordering, referring, or rendering physician or other health care provider. The claim form could be submitted in hard copy or electronically via interstate wire.

15. To enroll as a Medicare provider, Medicare required providers to agree to abide by Medicare laws, regulations, and program instructions. Medicare further required providers to certify that they understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute. Medicare paid for claims only if the items and services were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, accurately documented, and provided as represented to Medicare. Medicare would not pay for items and services that were procured through illegal kickbacks.

16. Medicare covered access to certain bioengineered skin substitutes, including some amniotic membrane allografts made from human placental tissue ("allografts"). These allografts were applied over open wounds to assist with wound closure or skin

growth. Medicare reimbursed providers for certain allografts furnished to Medicare beneficiaries only if the allografts were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, accurately documented, provided as represented to Medicare, and not procured through illegal kickbacks.

### CHAMPVA

17. The Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA") was a federal health care benefit program within the United States Department of Veterans Affairs ("VA"). CHAMPVA was a comprehensive health care program in which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans of the United States military who had been rated permanently and totally disabled for a service-connected disability and the surviving spouse or child of a veteran who died from a VA-related service-connected disability.

18. In general, CHAMPVA covered most health care services and supplies that were medically and psychologically necessary. CHAMPVA was always the secondary payer to another health benefit program, including Medicare, and reimbursed costs that the primary health care benefit program did not cover. For Medicare beneficiaries with CHAMPVA coverage, health care claims were first sent to Medicare for processing, and then Medicare electronically forwarded claims to CHAMPVA.

19. CHAMPVA was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

### TRICARE

20. TRICARE was a federal health insurance program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and their survivors. The Defense Health Agency

("DHA"), an agency of the DOD, was the governmental entity responsible for overseeing and administering TRICARE.

21. TRICARE offered health insurance benefits for items and services that were medically necessary. TRICARE reimbursed providers based on payment rates from applicable fee and rates schedules. Generally, when a beneficiary was eligible for Medicare and TRICARE, TRICARE was secondary to Medicare.

22. TRICARE was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

## Commercial Insurance Plans

23. Commercial insurance plans were provided by private health insurance companies ("Commercial Insurers") that offered individual and group health benefit plans under which individuals could obtain coverage for health care items and services. Individuals who received benefits from Commercial Insurers were referred to as "members."

24. Commercial Insurers often made payments directly to providers, rather than to members who received the health care benefits, items, and services.

25. To obtain payment for treatment or services provided to a member, providers were required to submit itemized claim forms to the member's commercial insurance plan. The claim forms were typically submitted electronically. The claim form required certain important information, including: (a) the member's name and identification number; (b) a description of the health care benefit, item, or service that was provided or supplied to the member; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the member; and (e) the name of the referring physician or other provider, as well as the applicable identification number for the referring physician or provider.

26. When a provider submitted a claim to Commercial Insurers, the provider certified that the contents of the form were true, correct, and complete, and that the form was prepared in compliance with applicable laws and regulations. The provider also certified that the items or services being billed were medically necessary and provided as represented.

27. Each of the Commercial Insurers referenced herein was a "health care benefit program," as defined in 18 U.S.C. § 24(b), and affected interstate commerce.

## COUNT 1
### Conspiracy to Commit Heath Care Fraud
### (18 U.S.C. § 1349)

28. The factual allegations in the preceding paragraphs are incorporated by reference and re-alleged as though fully set forth herein.

29. Beginning in or around January 2023, and continuing through in or around March 2024, in the District of Arizona and elsewhere, Defendants TYLER KONTOS, MAX KUPETZ, and JORGE KINDS, along with other individuals and entities known and unknown to the grand jury, knowingly and willfully agreed and conspired with each other and others to commit health care fraud in violation of 18 U.S.C. § 1347.

**Purpose of the Conspiracy**

30. The purpose of the conspiracy was for Defendants TYLER KONTOS, MAX KUPETZ, JORGE KINDS, and their co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare, TRICARE, CHAMPVA, and Commercial Insurers for items and services that were (i) medically unreasonable and unnecessary, (ii) ineligible for reimbursement, and (iii) procured through illegal kickbacks; (b) concealing the submission of false and fraudulent claims to Medicare, TRICARE, CHAMPVA, and Commercial Insurers; and (c) diverting proceeds of the fraud for the personal use and benefit of the Defendants and their co-conspirators, and to further the fraud.

- 8 -

**Manner and Means of the Conspiracy and Scheme**

31. The manner and means used by Defendants TYLER KONTOS, MAX KUPETZ, JORGE KINDS, and others to effect the objects of the conspiracy and scheme to defraud included the following:

    a. Apex and Viking contracted with medically untrained managers, including TYLER KONTOS, and medically untrained sales representatives, including MAX KUPETZ, to target facilities with elderly populations, including nursing homes, assisted living facilities, and hospice facilities, to identify patients with wounds of any size and any stage.

    b. TYLER KONTOS, MAX KUPETZ, and other sales representatives, including sales representatives acting at TYLER KONTOS's direction, obtained these patients' health insurance information, photographed the patients' wounds, measured the wounds, determined the quantity and size of allografts to order for the wounds, and ordered and arranged for and recommended the ordering and purchasing of Company 1's allografts for the wounds, all without coordinating with the patients' treating or primary care physicians.

    c. TYLER KONTOS, JORGE KINDS, and others recommended that sales representatives order Company 1's allografts for patients in specific sizes and quantities based solely on photographs of the patients' wounds taken by Apex and Viking sales representatives.

    d. To maximize profit, TYLER KONTOS, MAX KUPETZ, and others submitted and recommended "maxout" allograft orders, which they understood to be the maximum quantity and size of allografts that Medicare would reimburse for a single date of service.

    e. To conceal the fraud, TYLER KONTOS and others recommended that sales representatives arbitrarily vary the quantity and sizes of allografts ordered for patients for specific application weeks.

f.  TYLER KONTOS, MAX KUPETZ, and other sales representatives, including sales representatives acting at TYLER KONTOS's direction, referred the patients to Apex Mobile and APX, which purchased the allografts from Company 1 and contracted with nurse practitioners, including JORGE KINDS, to apply the allografts.

g.  JORGE KINDS and other nurse practitioners applied allografts to patients based on the determinations of, and in the sizes and quantities selected by, TYLER KONTOS, MAX KUPETZ, and other sales representatives, without a prior relationship with the patients, without reviewing the patients' medical records, without coordinating with the patients' treating or primary care physicians, and without exercising independent medical judgment.

h.  JORGE KINDS and other nurse practitioners applied allografts to patients that were medically unreasonable and unnecessary because, among other reasons, the wounds were infected, the wounds had already healed, the wounds were not responding to the allografts, and the allografts exceeded the size of the wounds.

i.  JORGE KINDS and other nurse practitioners applied allografts to terminally ill patients receiving palliative hospice care. Some patients died within days or the same day of the allograft application.

j.  Apex, Apex Mobile, and APX received illegal kickbacks from Company 1 in return for purchasing, ordering, and arranging for and recommending the purchasing and ordering of Company 1's allografts.

k.  TYLER KONTOS, MAX KUPETZ, and others received illegal kickbacks from Apex in return for ordering and arranging for and recommending the purchasing and ordering of Company 1's allografts, and in return for referring patients to Apex Mobile and APX for the furnishing of Company 1's allografts.

l.  JORGE KINDS and other nurse practitioners received a flat rate of $500 or $1,000 per patient encounter to apply the allografts.

  m. From in or around January 2023 through in or around February 2024, Apex Mobile and APX submitted over $1 billion in false and fraudulent claims to Medicare, CHAMPVA, TRICARE, and the Commercial Insurers for Company 1's allografts that were medically unreasonable and unnecessary, ineligible for reimbursement, and procured through illegal kickbacks. Medicare, CHAMPVA, TRICARE, and the Commercial Insurers paid Apex Mobile Medical and APX over $600 million based on those claims.

  n. From in or around January 2023 through in or around February 2024, Apex Mobile and APX submitted approximately $205 million in false and fraudulent claims to Medicare for Company 1's allografts furnished by JORGE KINDS to approximately 120 patients. Medicare paid approximately $130 million based on those claims.

  o. From in or around October 2023 through in or around March 2024, TYLER KONTOS received approximately $7.5 million in illegal kickbacks from Apex and Viking. TYLER KONTOS used these illegal proceeds to purchase real estate and luxury items, including an approximately $550,000 speedboat and an approximately $24,000 watch.

  p. From in or around April 2023 through in or around March 2024, MAX KUPETZ received approximately $8.1 million in illegal kickbacks from Apex and Viking.

  q. From in or around March 2023 through in or around March 2024, JORGE KINDS received approximately $1.3 million from Apex Mobile and APX. All in violation of 18 U.S.C. § 1349.

## COUNTS 2–6
## Health Care Fraud
## (18 U.S.C. §§ 1347, 2)

32. The factual allegations in paragraphs 1 through 27 are incorporated by reference and re-alleged as though fully set forth herein.

33. Beginning in or around January 2023, and continuing through in or around March 2024, in the District of Arizona and elsewhere, Defendants TYLER KONTOS, MAX KUPETZ, and JORGE KINDS, along with other individuals and entities known and unknown to the grand jury, in connection with the delivery of, and payment for, health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud Medicare, TRICARE, CHAMPVA, and Commercial Insurers, which are health care benefit programs as defined in 18 U.S.C. § 24(b), and to obtain by means of materially false and fraudulent pretenses, representatives, and promises, money and property owned by, and under the custody and control of, the health care benefit programs.

**Purpose of the Scheme**

34. Paragraph 30 above is incorporated by reference and re-alleged as though fully set forth herein as the purpose of the scheme.

**Manner and Means of the Scheme**

35. Paragraph 31 above is incorporated by reference and re-alleged as though fully set forth herein as the manner and means of the scheme.

**Executions of the Scheme**

36. On or about the dates specified below, in the District of Arizona and elsewhere, Defendants TYLER KONTOS, MAX KUPETZ, and JORGE KINDS, aided and abetted by, and aiding and abetting, others known an unknown to the grand jury, submitted and caused to be submitted the following false and fraudulent claims to Medicare for Company 1's allografts that were medically unreasonable and unnecessary, ineligible for reimbursement, and procured through illegal kickbacks, in an attempt to execute, and

in execution of, the scheme as described in paragraph 33 above, with each execution set forth below forming a separate count:

| Ct. | Defendant(s) | Approx. Claim Date | Medicare Patient | Billing Provider | Approx. Amount Billed to Medicare |
|---|---|---|---|---|---|
| 2 | MAX KUPETZ and JORGE KINDS | March 6, 2024 | Medicare Patient 1 | APX | $98,550 |
| 3 | MAX KUPETZ | June 23, 2023 | Medicare Patient 2 | APX | $94,500 |
| 4 | MAX KUPETZ and JORGE KINDS | November 22, 2023 | Medicare Patient 3 | APX | $99,625 |
| 5 | JORGE KINDS | August 8, 2023 | Medicare Patient 4 | APX | $99,900 |
| 6 | TYLER KONTOS | October 11, 2023 | Medicare Patient 5 | APX | $96,002 |

Each in violation of 18 U.S.C. § 1347 and 18 U.S.C. § 2.

## COUNT 7
**Conspiracy to Defraud the United States and
Solicit and Receive Health Care Kickbacks
(18 U.S.C. § 371)**

37. The factual allegations in paragraphs 1 through 27 are incorporated by reference and re-alleged as though fully set forth herein.

38. Beginning in or around January 2023, and continuing through in or around March 2024, in the District of Arizona and elsewhere, Defendants TYLER KONTOS, MAX KUPETZ, and JORGE KINDS, along with other individuals and entities known and unknown to the grand jury, knowingly and willfully agreed and conspired with each other and others to: defraud the United States by cheating the United States government and any of its departments and agencies out of money and property, and by impairing, impeding, obstructing, and defeating through deceitful and dishonest means the lawful government

functions of HHS and CMS in their administration and oversight of Medicare, VA in its administration and oversight of CHAMPVA, and DHA in its administration and oversight of TRICARE; and solicit and receive illegal kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1).

## Purpose of the Conspiracy

39. Paragraph 30 is incorporated by reference and re-alleged as though fully set forth herein as the purpose of the conspiracy.

## Manner and Means of the Conspiracy

40. Paragraph 31 is incorporated by reference and re-alleged as though fully set forth herein as the manner and means of the conspiracy.

## Overt Acts

41. In furtherance of the conspiracy, and to effect the objects of the conspiracy, Defendants TYLER KONTOS, MAX KUPETZ, and JORGE KINDS committed and caused to be committed various overt acts in the District of Arizona and elsewhere, including but not limited to the following:

 a. On or about February 6, 2023, JORGE KINDS deposited a $1,700 check into bank account ending in 9514 that was drawn on Apex Mobile bank account ending in 2833.

 b. On or about June 10, 2023, MAX KUPETZ recommended the ordering of four 4x8 cm allografts to be applied to Medicare Patient 2.

 c. On or about July 11, 2023, MAX KUPETZ, through his company Karma Medical Consulting LLC, received an illegal kickback in the approximate amount of $367,740 from Apex's bank account ending in 9686.

 d. On or about September 22, 2023, TYLER KONTOS instructed an Apex sales representative to order or recommend a "[m]axout" allograft order to be applied by an APX nurse practitioner.

 e. On or about October 6, 2023, JORGE KINDS applied allografts sold by Company 1 to Medicare Patient 4.

f.      On or about November 1, 2023, JORGE KINDS applied allografts sold by Company 1 to Medicare Patient 3.

g.      On or about December 12, 2023, TYLER KONTOS, through his company Wild West Medical Consulting LLC, received an illegal kickback in the approximate amount of $1,604,552.86 from Apex's bank account ending in 9686.

h.      On or about January 16, 2024, MAX KUPETZ, through his company Karma Medical Consulting LLC, received an illegal kickback in the approximate amount of $1,698,620 from Apex's bank account ending in 9686.

All in violation of 18 U.S.C. § 371.

## COUNTS 8–9
### Receiving Health Care Kickbacks
### (42 U.S.C. § 1320a-7b(b)(1); 18 U.S.C. § 2)

42.     The factual allegations in paragraphs 1 through 27, 30, and 31 are incorporated by reference and re-alleged as though fully set forth herein.

43.     On or about the approximate dates set forth below, in the District of Arizona and elsewhere, Defendant MAX KUPETZ. aided and abetted by, and aiding and abetting, others known an unknown to the grand jury, did knowingly and willfully solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for (a) referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, and (b) purchasing, leasing, ordering, and arranging for and recommending purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made in whole and in part by a Federal health care program, as set forth below:

| Ct. | Approx. Date | Originating Account | Receiving Account | Approx. Amount |
|---|---|---|---|---|
| 8 | July 11, 2023 | Apex's Bank Account Ending in 9686 | Karma Medical Consulting LLC Bank Account Ending in 9331 | $367,740 |
| 9 | January 16, 2024 | Apex's Bank Account Ending in 9686 | Karma Medical Consulting LLC Bank Account Ending in 9331 | $1,698,620 |

Each in violation of 42 U.S.C. § 1320-7b(b)(1) and 18 U.S.C. § 2.

### COUNTS 10–11
### Transactional Money Laundering
### (18 U.S.C. §§ 1957, 2)

44. The factual allegations in paragraphs 1 through 27, 30, and 31 are incorporated by reference and re-alleged as though fully set forth herein.

45. On or about the approximate dates listed below, Defendants TYLER KONTOS and MAX KUPETZ, aided and abetted by, and aiding and abetting, other individuals and entities known and unknown to the grand jury, in the District of Arizona and elsewhere, knowingly engaged and attempted to engage in the following monetary transactions in the United States with criminally derived property of a value exceeding $10,000, derived from specified unlawful activity, namely conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, health care fraud, in violation of 18 U.S.C. § 1347, conspiracy to defraud the United States and receive illegal health care kickbacks, in violation of 18 U.S.C. § 371, and receiving illegal health care kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1):

| Ct. | Defendant | Approx. Date | Originating Account | Description of Item Purchased | Approx. Amount |
|---|---|---|---|---|---|
| 10 | MAX KUPETZ | August 17, 2023 | Joel M Kupetz Bank Account Ending in 0920 | Coinbase Cryptocurrency | $300,000 |
| 11 | TYLER KONTOS | December 18, 2024 | Wild West Medical Consultant LLC Bank Account Ending in 9091 | Pavati Boat | $152,020 |

Each in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 2.

**FORFEITURE ALLEGATIONS**

46. The factual allegations in the preceding paragraphs are incorporated by reference and re-alleged as though fully set forth herein.

47. Pursuant to 18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461(c), and upon conviction of one or more of the offenses alleged in Counts 1 through 11 of this Indictment, the Defendants shall forfeit to the United States all right, title, and interest in any and all property, real or personal, involved in such offense(s), or any property traceable to such property involved in the offense(s), or conspiracy to commit such offense(s), including the following: (a) all property constituting proceeds obtained as a result of a violation of a statute listed in 18 U.S.C. §§ 981 or 982, and (b) all property used in any manner or part to commit or involved with the commission of a money laundering transaction in violation of 18 U.S.C. § 1957, including but not limited to the sum of money representing the amount of money involved in the offenses and the property named below.

a. The property at 2235 East Minton St., Mesa, Arizona 85213, titled to TYLER KONTOS, Maricop County APN 141-06-030, Legal Description: LOT 16, OF VILLAGE GROVE ESTATES, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 295 OF MAPS, PAGE 23 AND CERTIFICATE OF CORRECTION RECORDED AUGUST 26, 1987 IN 87-537356 OF OFFICIAL RECORDS.

   b. The property at 2440 East Medicine Lake Blvd., Plymouth, Minnesota 55441, titled to TYLER KONTOS, Legal Description: Lots 22 and 23, Block 8, Rearrangement of Medicine Lake Park, Third Division, Hennepin County, Minnesota..

   c. The property at 5232 North 14th Pl., Phoenix, Arizona 85014, titled to JOEL MAX KUPETZ, Maricopa County APN 162-11-062, Legal Description: Lot 58, of SHERWOOD VILLAGE, according to Book 53 of Maps, Page 34, records of Maricopa County, Arizona

48. If any of the above-described forfeitable property, as a result of any act or omission of the defendant(s):

   a. cannot be located upon the exercise of due diligence,

   b. has been transferred or sold to, or deposited with, a third party,

   c. has been placed beyond the jurisdiction of the court,

   d. has been substantially diminished in value, or

   e. has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States to seek forfeiture of any other property of said defendant(s) up to the value of the above-described forfeitable property, pursuant to 21 U.S.C. § 853(p).

///
///
///

All in accordance with 18 U.S.C. §§ 981 and 982, 21 U.S.C. § 853, 28 U.S.C. § 2461(c), and Federal Rule of Criminal Procedure 32.2.

A TRUE BILL

       //s//
FOREPERSON OF THE GRAND JURY
Date: June 18, 2025

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

       //s//
MATTHEW WILLIAMS
Assistant U.S. Attorney

LORINDA LARYEA
Acting Chief, Fraud Section
United States Department of Justice

       //s//
WILLIAM HOCHUL III
SHANE BUTLAND
Trial Attorneys